THE STATE OF WASHINGTON, *Respondent,* v. JOSEPH
DWAYNE ROCHE, *Appellant.*

*David L. Donnan,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Michele Hauptman, Deputy,* for respondent.

[As amended by order of the Court of Appeals September 22, 1994.]

PEKELIS, A.C.J. — Joseph Roche (Roche) appeals his conviction and sentence for first degree robbery, challenging the trial court's: (1) admission of his prior felony convictions for impeachment purposes; (2) refusal to give a lesser included offense instruction on first degree theft; and (3) calculation of the offender score.

The events leading up to Roche's conviction began on the morning of January 31, 1992, when Mohammed Owjama (Owjama), a Yellow Cab driver, picked up Roche. According to Owjama, he picked up Roche in downtown Seattle on Second Avenue and Pike Street or Pine Street. Roche immediately asked for Owjama's business card. Roche initially asked to be taken to 601 Belmont Avenue East, but then asked to be taken to 22nd Avenue and Jefferson Street because he had forgotten something. Owjama waited and then took Roche to 601 Belmont East, as requested. Upon arriving, Roche insisted that Owjama drop him off behind the apartment complex, instead of the front where Owjama usually drops off passengers. Owjama complied and waited to be paid his fare. Roche, who was sitting in the back seat, grabbed Owjama by the hair with his left hand, in which he was also wielding a knife, pointed a black pistol to Owjama's head with his right hand, and said, "I need your money and your car or otherwise I will kill you". Owjama then grabbed the microphone from his radio and quickly exited the cab. Owjama radioed the dispatcher of an emergency at 601 Belmont Avenue East. Roche got into the driver's seat and drove away, damaging the cab in the process.

Roche's version of events differs from Owjama's. According to Roche, Owjama picked him up on 25th Avenue and Cherry

Street. Roche asked Owjama whether he used cocaine and "that is why [he] asked for his business card". Roche initially asked to be taken to 23rd Avenue and Union Street, but changed his destination to 22nd Avenue and Jefferson Street because he had forgotten something. Upon arriving at 22nd Avenue and Jefferson Street, Roche gave Owjama some cocaine as payment while he waited. Roche returned to the cab and asked to be taken to 601 Belmont Avenue East. Upon arriving, Roche asked to be dropped off in the parking lot behind the complex so that they could finish smoking cocaine. While they were smoking, Roche asked why the meter was still running. When Roche gave Owjama $20 for the fare, Owjama gave him $4 in change. Roche told Owjama that he owed him $5 more in change. When Owjama refused, Roche stated, "if you [don't] give me back my five dollars, I [am] going to hit you". At that point, Owjama radioed that he was being robbed by a man with a gun. Owjama then fled the cab and slammed the door. Roche got behind the wheel and drove off because he "was mad and . . . agitated . . . and [he] panicked" after hearing Owjama's emergency radio report. Roche maintains that he never had a gun or a knife.

The events which followed are not in dispute. Owjama, aided by Charlotte Alexander (Alexander), formerly Cheryl Wells, pursued the cab in her car. When they eventually caught up to it at a stop light, Owjama jumped out, ran to the cab, got inside, and wrestled Roche to the outside of the cab. Roche and Owjama were separated by several cab drivers who arrived at the scene. Seattle Police Department officers were dispatched to the scene.

William Stein (Stein), a cab driver who arrived at the scene, looked in the cab after a police officer allegedly asked him to find Owjama's trip sheet. As he was searching for it, he saw what appeared to be the butt of a pistol partially concealed by papers scattered on the cab's floor. When he picked it up, he discovered it was a toy gun. Stein gave the gun to Seattle Police Officer Melinda Wilson.

Roche was arrested at the scene. He was charged by information with robbery in the first degree contrary to RCW 9A.56.190 and RCW 9A.56.200(1)(b).

Prior to trial, the court ruled that Roche's four misdemeanor theft convictions and one misdemeanor false reporting conviction would be automatically admissible for impeachment purposes as crimes of dishonesty under ER 609(a)(2). The court decided that Roche's felony conviction for taking a motor vehicle without permission was not a crime of dishonesty and therefore not automatically admissible under ER 609(a)(2). The court weighed the probative value of this conviction and his two felony convictions for cocaine possession against their prejudicial effect in deciding whether they would be admissible for impeachment purposes under ER 609(a)(1). The court determined that the felony convictions would be admissible for impeachment purposes, but that it would be Roche's decision to name them.

At trial, Owjama testified on cross examination that he never used cocaine with Roche. On redirect examination, Owjama testified that he has never used cocaine because drug use is contrary to the Muslim religion.

Stein testified on cross examination that when he arrived at the scene, Owjama's eyes were "really red" and that "[b]etween the yelling and the screaming, they seemed to be talking about drugs and things like that going on, but it was hard to tell who was saying what about what at that point". Stein also testified that Yellow Cab had a policy prohibiting cab drivers from parking on 1st Avenue and Pike Street and 23rd Avenue and Cherry Street because of drug activity. He testified that 22nd Avenue and Jefferson Street was known for drug activity. He testified to having personal knowledge of cab drivers who dealt drugs from their cabs.

Officer Wilson testified that Owjama's eyes were bloodshot when she arrived at the scene, but that his performance of field sobriety tests led her to conclude that he was not under the influence.[1] Officer Wilson testified to having seen Stein reach into the cab and to having received the toy pistol from him, but denied asking him to look for Owjama's trip sheet. She testified that Owjama's business card was found on Roche following his arrest.

---

[1]Alexander also testified that Owjama did not appear to be under the influence of drugs.

On direct examination, Roche testified that he had used cocaine the morning of January 31, 1992. He testified that he had been previously convicted of taking a motor vehicle without permission and that he had been twice convicted of cocaine possession. He also testified to the misdemeanor theft convictions. On cross examination, the prosecutor reviewed Roche's felony and misdemeanor convictions individually. At the end of this examination the court admonished:

> [I] just want to emphasize to the jury that the fact that the defendant has been previously convicted of a crime is not evidence of the defendant's guilt in this case. Such evidence may be considered by you only in deciding what weight or credibility should be given the testimony of the defendant, and for no other purposes.

Prior to the jury deliberations, defense counsel objected to the trial court's refusal to instruct the jury on first degree theft, which she argued was a lesser included offense. The court instructed the jury that it could convict Roche of the lesser included offense, second degree theft. In addition, the court instructed:

> Evidence that the defendant has previously been convicted of a crime is not evidence of the defendant's guilt. Such evidence may be considered by you in deciding what weight or credibility should be given to the testimony of the defendant and for no other purpose.

Roche was convicted of first degree robbery. At sentencing, no objection was made to the State's calculation of Roche's offender score as 5, which resulted in a standard range of 57 to 75 months. An April 27, 1983, California juvenile conviction for robbery was included in his criminal history. Roche received a 69-month standard range sentence.

Roche appeals.

## I

### Admission of Felony Convictions Under ER 609(a)(1)

Roche contends that the trial court abused its discretion when it admitted his three felony convictions for impeachment under ER 609(a)(1).

As a preliminary matter, we first address which felony convictions are at issue for purposes of ER 609(a)(1). Although

the trial court ruled that Roche's felony conviction for taking a motor vehicle without permission was not automatically admissible as a crime of dishonesty under ER 609(a)(2), this court has since held to the contrary. *State v. Trepanier*, 71 Wn. App. 372, 381, 858 P.2d 511 (1993). Thus, we need only decide whether the trial court erred in admitting Roche's two felony convictions for possession of cocaine under ER 609(a)(1).

■ Before a prior conviction for impeachment under ER 609(a)(1) can be properly admitted, the trial court must balance the *Alexis*[2] factors on the record to determine whether the probative value of the prior convictions outweighs their prejudicial effect.[3] *State v. Jones*, 101 Wn.2d 113, 122, 677 P.2d 131 (1984), *overruled on other grounds by State v. Brown*, 111 Wn.2d 124, 761 P.2d 588 (1988), *adhered to on rehearing*, 113 Wn.2d 520, 782 P.2d 1013, 787 P.2d 906, 80 A.L.R.4th 989 (1989); *State v. Gomez*, 75 Wn. App. 648, 873 P.2d 1203, 1205 (1994).[4] Those factors are: (1) the length of the defendant's criminal record; (2) the remoteness of the prior conviction(s); (3) the nature of the prior crime(s); (4) the centrality of the credibility issue; and (5) the impeachment value of the prior crime(s). *Alexis*, 95 Wn.2d at 19. The State has the burden of establishing that the probative value of the prior convictions outweighs their prejudicial effect. *Jones*, 101 Wn.2d at 120.

The trial court balanced the *Alexis* factors as follows:

[T]he defendant's criminal history is quite extensive within the past two years, two or three years if we include those Municipal Court convictions. However, even with the two VUCSA's and Taking a Motor Vehicle, which are the felonies, within the

---

[2]*State v. Alexis*, 95 Wn.2d 15, 19, 621 P.2d 1269 (1980).

[3]Prejudice from the admission of prior convictions primarily stems from the risk that the jury will treat the prior convictions as substantive evidence that the defendant acted in conformity with his or her criminal nature. *State v. Jones*, 101 Wn.2d 113, 120, 677 P.2d 131 (1984), *overruled on other grounds by State v. Brown*, 111 Wn.2d 124, 761 P.2d 588 (1988), *adhered to on rehearing*, 113 Wn.2d 520, 782 P.2d 1013, 787 P.2d 906, 80 A.L.R.4th 989 (1989).

[4]Subsequent to the filing of this opinion, *State v. Gomez*, originally filed June 6, 1994, and withdrawn by order dated August 18, 1994, was refiled on September 6, 1994.

past two years, three convictions is quite extensive. These convictions are of quite recent origin. . . .

It is my understanding the defendant is 26 years old, presently, and at the time of the convictions would have been, at youngest, 23 years old . . . .

Although the trial court considered some of the *Alexis* factors, we do not consider merely referencing an "extensive" and "recent" criminal history to constitute a satisfactory analysis. As our Supreme Court has stated, "[i]t is imperative that this balancing process be meaningful." *Jones*, at 122.

Here, the trial court's approach was deficient in several respects. First, the trial court failed to mention, let alone weigh, two factors that are particularly significant — the centrality of the credibility issue and the impeachment value of the prior crimes. *See, e.g., Gomez*, at 653-54; *Jones*, 101 Wn.2d at 118-22. Second, the trial court failed to balance the obvious prejudice associated with the admission of two additional felony convictions against their probative value.

As to the omitted factors, not only are they important, but they can weigh for or against admission depending on how they are analyzed. For example, although credibility was concededly central to this case, it is unclear whether the convictions would have been admitted had this factor been considered. *See Gomez*, at 653-54. In *Gomez*, we compared decisions analyzing this factor as weighing both for and against admission of prior convictions. *Compare, e.g., Alexis*, 95 Wn.2d at 19 (recognizing that admission is important to the evaluation of witness credibility) *with Jones*, 101 Wn.2d at 120 (recognizing that admission may negatively impact the defendant's decision to testify).

The impeachment value of Roche's two possession convictions is also a close question subject to opposite conclusions. Roche contends that his two possession convictions simply do not reflect upon his dishonesty and therefore offer little assistance in assessing his credibility. The State responds that the jury was "entitled" to know of Roche's prior felony convictions. This argument comes perilously close to that

made in *Jones*, that *all* prior felony convictions are admissible per se. *Jones*, at 119. The *Jones* court rejected this argument, cautioning that "few prior offenses that do not involve crimes of dishonesty or false statement are likely to be probative of a witness' veracity."[5] *Jones*, at 119-20.

Finally the trial court's failure to give any consideration to the prejudice associated with his lengthy criminal record is troublesome. "[U]nnecessarily cumulative prior convictions" are more prejudicial. *Jones*, at 121-22. The availability of other evidence with which to assess the defendant's credibility favors the exclusion of the prior convictions. *See Alexis*, 95 Wn.2d at 20. Because six convictions were already properly admitted under ER 609(a)(2) as crimes of dishonesty, Roche makes a compelling argument that this factor weighs in favor of excluding his two possession convictions.

Both parties suggest that we can independently substitute our analysis of the *Alexis* factors for that of the trial court. Roche asks that we reverse, while the State asks that we affirm.

On occasion, this court has substituted its analysis for the trial court's, but only when the result was obvious had the trial court engaged in a proper analysis. *See, e.g., State v. Bond*, 52 Wn. App. 326, 333, 759 P.2d 1220 (1988). In those cases, we independently balanced the *Alexis* factors for efficiency purposes.[6] *See, e.g., Bond*, at 333-34. On this record, however, the result is not obvious because the *Alexis* factors omitted by the trial court weigh for and against admission. As a result, we cannot independently analyze the propriety of admitting the felony convictions.

---

[5] In *Gomez*, we rejected a similar argument, but questioned the reason for admitting ER 609(a)(1) felonies at all "if the fact of conviction itself is not somehow probative of credibility." *Gomez*, at 655 n.7.

[6] At the same time, we have cautioned: "[A]ppellate review in this manner is an inappropriate substitute for a meaningful consideration of this issue at the trial level. The cases allowing appellate courts to resolve this issue where the trial court has not done so were not intended to create an exception to swallow the rule, nor did those cases contemplate that we substitute our analysis of the *Alexis* factors as a matter of course." *Gomez*, at 656 n.11.

■ ■ However, because a trial court's ER 609 ruling is not one of constitutional magnitude, reversal is not required unless the defendant can show that " ' ". . . within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected." ' " *State v. Ray*, 116 Wn.2d 531, 546, 806 P.2d 1220 (1991) (quoting *State v. Smith*, 106 Wn.2d 772, 780, 725 P.2d 951 (1986)).

We are confident that the trial court's failure to conduct a complete analysis was harmless error. While credibility was important to a determination of what occurred before Roche took the cab, even if Roche's rendition was accepted as true, the evidence still remains that: (1) Roche threatened to hit Owjama if he did not return the proper change; (2) he drove away with the cab; and (3) a toy gun was found in the cab. In light of this uncontroverted evidence, it cannot be said that the outcome would have been materially different had the error not occurred. Moreover, under the unique facts of this case, where six convictions were automatically admissible under ER 609(a)(2), it is highly unlikely that Roche's two possession convictions could have impacted the jury, especially when Roche admitted to using cocaine the morning of the robbery.

## II

### INSTRUCTION ON LESSER INCLUDED OFFENSE

Roche next contends that the trial court erroneously refused to instruct the jury on theft in the first degree, which he argues is a lesser included offense of first degree robbery.

■ A defendant's right to a lesser included offense instruction is derived from statute. RCW 10.61.006; *State v. Davis*, 121 Wn.2d 1, 4, 846 P.2d 527 (1993). Such an instruction is required when: (1) each of the elements of the lesser offense are necessary elements of the charged offense; and (2) the evidence in the case supports an inference that the defendant committed the lesser offense. *See, e.g., Davis*, 121 Wn.2d at 4; *State v. Workman*, 90 Wn.2d 443, 447-48, 584 P.2d 382 (1978). These requirements have been denominated as the " 'legal' "

and "'factual'" prongs of the lesser included offense test. *State v. Walden*, 67 Wn. App. 891, 893, 841 P.2d 81 (1992).

Under the legal prong, an instruction on the lesser offense is proper "only if the charged crime 'could not be committed' without also committing the lesser offense." *Walden*, 67 Wn. App. at 893 (quoting *State v. Curran*, 116 Wn.2d 174, 183, 804 P.2d 558 (1991)). Under this test, a lesser included instruction is inappropriate when alternative means exist by which the charged crime can be committed, one of which would not result in the commission of the alleged lesser included offense. *See Davis*, 121 Wn.2d at 5-6 (holding that there are no lesser included offenses of second degree felony murder because of the multiple means of committing the offense); *see also Curran*, 116 Wn.2d at 183 (holding that an instruction on reckless driving was inappropriate as a lesser included offense of vehicular homicide because the offense could be committed by the alternative means of driving with disregard for the safety of others).

Accordingly, if *first degree* robbery can be committed by alternative means, one of which would not result in the commission of first degree theft, no lesser included instruction is available.

Robbery is statutorily defined as:

> A person commits robbery when he unlawfully takes personal property from [1] the person of another *or* [2] in his presence against his will by the use or threatened use of immediate force, violence, or fear of injury to that person or his property or the person or property of anyone. Such force or fear must be used to obtain or retain possession of the property, or to prevent or overcome resistance to the taking . . ..

(Italics ours.) RCW 9A.56.190. First degree robbery occurs when the defendant is armed with a deadly weapon, appears to be armed with a deadly weapon, or inflicts bodily injury. RCW 9A.56.200.

The elements of theft in the first degree are: (1) wrongfully obtaining or exerting unauthorized control over (2) the property of another (3) with the intent to deprive him of such property (4) valued in excess of $1,500 *or* "taken from

the person of another" regardless of the value. RCW 9A.56.020(1)(a), and .030(1)(a), (b).

■ Under the robbery statute, robbery can be committed by two alternative means: (1) taking property "from the person of another" or (2) taking property "in his presence". RCW 9A.56.190. Under the theft statute, first degree theft can be committed by two alternative means: (1) taking property valued in excess of $1,500 or (2) taking property "from the person of another". A comparison of the elements of both offenses reveals two reasons why first degree theft is not a lesser included offense of first degree robbery.

First, one alternative means of committing robbery is by taking property in the presence of another, which is not an element of first degree theft.[7] Second, under either means of committing robbery, the property need not be valued in excess of $1,500, which is an alternative means of committing first degree theft.

Because robbery can be committed without committing first degree theft when a person takes property: (1) in the presence of another person or (2) valued at less than $1,500, *first degree* theft is not a lesser included offense of first degree robbery.[8] Accordingly, the legal prong has not been met and the trial court did not err in refusing to give a lesser included instruction.

### III

CALCULATION OF THE OFFENDER SCORE

Finally, Roche contends that the sentencing court miscalculated his offender score by erroneously classifying his

---

[7]Roche erroneously relies on *Turner v. Ohio*, 1 Ohio St. 422 (1853) for the proposition that "from the person of another" as used in the first degree theft statute, includes in the presence of another, as used in the robbery statute. *Turner* is irrelevant because the court interpreted a *robbery* statute, not a *theft* statute. Moreover, rules of statutory construction support the conclusion that "from the person of another", as used in our robbery and first degree theft statutes, does not include "in his presence" as used only in the robbery statute. We presume that the Legislature intentionally omitted the phrase "or in his presence", from the first degree theft statute. *See State v. Reese*, 12 Wn. App. 407, 409, 529 P.2d 1119 (1974), *review denied*, 85 Wn.2d 1005 (1975).

[8]Although Roche addressed his argument to *first degree* robbery, we note that our analysis applies equally to second degree robbery.

California juvenile conviction for robbery as a class A felony.

In determining which juvenile offenses shall be included in the defendant's criminal history for purposes of calculating the offender score, RCW 9.94A.030(12)(b) provides:

"Criminal history" shall . . . also include a defendant's other prior convictions in juvenile court if: (i) The conviction was for an offense which is a felony or a serious traffic offense and is criminal history as defined in RCW 13.40.020(6)(a); (ii) the defendant was fifteen years of age or older at the time the offense was committed; and (iii) *with respect to prior juvenile class B or C felonies . . . the defendant was less than twenty-three years of age at the time the offense for which he or she is being sentenced was committed.*

(Italics ours.)

Roche contends that his 1983 juvenile conviction for robbery in California is classified as a class B felony in Washington. If Roche is correct, then RCW 9.94A.030(12)(b) requires that the juvenile conviction be excluded from his criminal history because he was 26 years old when the underlying offense was committed.

The State responds that the record does not allow us to determine how the California juvenile robbery conviction would be classified in Washington. According to the State, had Roche objected to the offender score calculation at sentencing and requested an evidentiary hearing, a record would have been developed with which to decide this issue. The State argues that Roche's failure to do so constitutes a waiver of the right to appellate review of this issue.

 We addressed the issue of whether sentencing errors may be raised for the first time on appeal in *State v. Paine*, 69 Wn. App. 873, 881, 850 P.2d 1369, *review denied*, 122 Wn.2d 1024 (1993). There, the defendant argued that the State had waived the right to challenge the reasons supporting an exceptional sentence downward because it had failed to object below. After an extensive review of Washington case law, the court concluded:

[I]t appears to us that the cases addressing the review of sentencing errors on appeal have established a common law rule that when a sentencing court acts without statutory authority

in imposing a sentence, that error can be addressed for the first time on appeal.

A justification for the rule is that it tends to bring sentences in conformity and compliance with existing sentencing statutes and avoids permitting widely varying sentences to stand for no other reason than the failure of counsel to register a proper objection in the trial court.

*Paine*, at 884.

It is axiomatic that a sentencing court acts without statutory authority when it imposes a sentence based on a miscalculated offender score. *See State v. Brown*, 60 Wn. App. 60, 70, 802 P.2d 803 (1990) ("[f]ailure to base a sentence on the proper offender score . . . contravenes the stated purpose of the Sentencing Reform Act of 1981"), *review denied*, 116 Wn.2d 1025 (1991), *overruled on other grounds by State v. Chadderton*, 119 Wn.2d 390, 832 P.2d 481 (1992). Thus, a challenge to the offender score calculation is a sentencing error that may be raised for the first time on appeal.[9]

■ The calculation of the offender score is reviewed de novo. *See, e.g., State v. Allyn*, 63 Wn. App. 592, 596, 821 P.2d 528 (1991), *review denied*, 118 Wn.2d 1029 (1992). Roche contends that we can determine as a matter of law that his juvenile California robbery conviction would not be classified as a class A felony in Washington. We disagree. The record before us does not allow for a determination of the proper classification of the conviction.[10]

■ RCW 9.94A.360(3) provides that "[o]ut-of-state convictions for offenses shall be classified according to the compar-

---

[9]We note that the State's reliance on *State v. McAlpin*, 108 Wn.2d 458, 740 P.2d 824 (1987) for the proposition that Roche waived the right to challenge the offender score calculation is misplaced. There, McAlpin challenged for the first time on appeal the accuracy of the *factual information* contained in the presentence report, which the court relied on to impose an exceptional sentence. Because McAlpin had failed to timely challenge the juvenile record at sentencing when he was expressly given the opportunity to do so, the court held that he waived the right to raise the issue on appeal. *McAlpin*, at 462. In contrast, Roche challenges for the first time on appeal the calculation of the offender score as *contrary to law*.

[10]Although Roche contends that the documents relating to the juvenile conviction, which he attached to his reply brief, prove that his robbery conviction would not be classified as first degree robbery in Washington, these documents are not contained in the record. Moreover, even if we were to rely on these documents, they do not clearly support Roche's position.

able offense definitions and sentences provided by Washington law." First, we must determine whether a " 'comparable' " Washington "'offense definition' " exists. *State v. Weiand*, 66 Wn. App. 29, 31, 831 P.2d 749 (1992). This is done by comparing the elements of the out-of-state crime with the elements of potentially comparable Washington crimes.[11] *Weiand*, at 31. If a comparable Washington "offense definition" exists, the court must next determine how that definition is classified under Washington law. *Weiand*, at 32. This inquiry requires the court to determine whether the definition is classified as a felony, and if so, whether it is an A, B, or C felony. *Weiand*, at 32.

Because the record is devoid of the underlying facts upon which Roche's California robbery conviction was based, it is impossible to determine how it would be classified in Washington. Therefore, the conviction must be removed from the calculation of Roche's criminal history unless, on remand, the State can establish that it would constitute a class A felony under Washington law. *See State v. Cabrera*, 73 Wn. App. 165, 169, 868 P.2d 179 (1994) (holding that where the defendant challenges the use of documents purporting to establish the Washington classification of an out-of-state conviction, the State must present additional evidence of the proper classification so as to carry its burden of proving the defendant's criminal history by a preponderance of the evidence); *see also State v. Herzog*, 48 Wn. App. 831, 834, 740 P.2d 380 (1987) (the State must establish the defendant's criminal history by a preponderance of the evidence), *aff'd*, 112 Wn.2d 419, 771 P.2d 739 (1989); RCW 9.94A.110.

· Reversed and remanded for recalculation of the offender score in a manner consistent with this opinion.

GROSSE and BECKER, JJ., concur.

---

[11]The court must use the elements of the Washington crimes which were in effect when the out-of-state crime was committed. *Weiand*, at 33.